[Cite as *de Bourbon v. State Med. Bd.*, 2018-Ohio-4682.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ernest B. de Bourbon, III, M.D., | : | |
| Appellant-Appellant, | : | No. 17AP-769 |
| | | (C.P.C. No. 16CV-7190) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| State Medical Board of Ohio, | : | |
| Appellee-Appellee. | : | |

## D E C I S I O N

### Rendered on November 20, 2018

**On brief**: *Graff & McGovern, LPA*, and *James M. McGovern*, for appellant. **Argued**: *James M. McGovern*.

**On brief**: *Mike DeWine*, Attorney General, and *Kyle C. Wilcox*, for appellee. **Argued**: *Kyle C. Wilcox*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, P.J.

{¶ 1} Ernest B. de Bourbon, III, M.D., appellant, appeals the judgment of the Franklin County Court of Common Pleas, in which the court affirmed the order of the State Medical Board of Ohio ("board"), appellee.

{¶ 2} Appellant is a licensed physician. In January 2015, the board charged appellant with falling below the standard of care with regard to two patients, "Patient 1" and "Patient 2," and stated that it would consider whether to sanction appellant based on the failure to appropriately treat those patients, to properly document their treatment, and to conform to the minimal standards of care. Appellant performed liposuction and lipoplasty on Patient 1 in 2007, and the board alleged she suffered disfigurement as a

result. Appellant performed liposuction and fat transfer on Patient 2 in October 2011, and Patient 2 died during the procedure due to an embolism. Appellant requested an administrative hearing on the allegations.

{¶ 3} In February and April 2016, hearings took place before the board's hearing examiner. At the hearing, appellant, Dr. Robert Lewis (the board's expert) and Dr. Marvin Borsand (appellant's expert) testified.

{¶ 4} On May 31, 2016, the hearing examiner issued a report and recommendation. The hearing examiner recommended appellant's license be suspended for a minimum period of 180 days, that he be required to undergo monitoring, and a permanent limitation be placed on his license that bars him from performing liposuction procedures. On June 14, 2016, appellant filed objections to the report and recommendation. On July 13, 2016, the board issued an entry of order, in which it adopted the hearing examiner's report and recommendation, with the exception the minimum suspension be increased to 365 days.

{¶ 5} Appellant appealed the board's order to the Franklin County Court of Common Pleas. On October 5, 2017, the common pleas court issued a decision and judgment entry, in which the court affirmed the board's order.

{¶ 6} Appellant appeals the judgment of the trial court, asserting the following four assignments of error:

> [I.] The lower court abused its discretion by affirming the Medical Board's Adjudication Order, because the Adjudication Order was blatantly lacking the reliable, probative and substantial evidence required under R.C. 119.12 to affirm an administrative agency order.
>
> [II.] The lower court erred as a matter of law in affirming the Medical Board's Adjudication Order, because the Medical Board violated R.C. 119.09 and Dr. de Bourbon's due process rights by failing to charge him with not having the required training and experience to perform liposuction procedures, while still using his purported lack of training and experience as a basis for the sanction imposed through it Adjudication Order.
>
> [III.] The lower court erred as a matter of law in affirming the Medical Board's Adjudication Order, because the Medical Board violated R.C. 4731.22(F) and Dr. de Bourbon's due

process rights by failing to allow him to subpoena and present evidence of the Medical Board Quality Intervention Program's previous handling of concerns related to his care of one of the two patients that later became the basis for the sanction imposed through the Medical Board's Adjudication Order.

[IV.] The lower court erred as a matter of law in affirming the Medical Board's Adjudication Order, because the Medical Board's Adjudication Order imposed practice plan and monitoring physician requirements as part of the sanction that violated this Court's holding in *In re Eastway* (1994), 95 Ohio App.3d 516.

{¶ 7} Appellant argues in his first assignment of error the trial court abused its discretion when it affirmed the board's order because the order was lacking the reliable, probative, and substantial evidence required under R.C. 119.12 to affirm an administrative agency order.

{¶ 8} In reviewing an order of an administrative agency under R.C. 119.12, a common pleas court must consider the entire record to determine whether reliable, probative, and substantial evidence supports the agency's order and whether the order is in accordance with law. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 110 (1980). The common pleas court's "review of the administrative record is neither a trial *de novo* nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (1st Dist.1981), quoting *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280 (1955). The common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, but "the findings of the agency are by no means conclusive." *Conrad* at 111. On questions of law, the common pleas court conducts a de novo review, exercising its independent judgment in determining whether the administrative order is " 'in accordance with law.' " *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993), quoting R.C. 119.12.

{¶ 9} An appellate court's review of an administrative decision is more limited. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). The appellate court is to determine only whether the common pleas court abused its discretion. *Id.*; *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218 (1983). On review of purely legal questions, however, an

appellate court has de novo review. *Big Bob's, Inc. v. Ohio Liquor Control Comm.*, 151 Ohio App.3d 498, 2003-Ohio-418, ¶ 15 (10th Dist.).

{¶ 10} In the present case, appellant presents myriad arguments under his first assignment of error. Appellant first argues the board's order includes several evidentiary flaws. First, appellant asserts the testimony offered by Dr. Lewis, the state's expert witness, did not conform to what is required for standard of care opinions. Appellant contends Dr. Lewis never reviewed the board's liposuction rules at issue until he was asked by the board to review the case, Dr. Lewis had never performed a laser-assisted lipoplasty procedure (the procedure performed on Patient 1), Dr. Lewis did not know the difference between laser and VASER liposuction (the procedure performed on Patient 2), and Dr. Lewis admitted that cardiac arrest and death due to pulmonary embolism is a recognized complication of liposuction/fat transfer.

{¶ 11} We find none of these arguments availing. Despite the fact Dr. Lewis did not review the board's liposuction rules at issue until he was asked by the board to review the present case, Dr. Lewis testified he reviewed the Ohio Administrative Code regulations regarding liposuction in the office setting and was familiar with them. As for the fact Dr. Lewis never performed a laser-assisted lipoplasty procedure, appellant fails to present any authority that this should disqualify him from being a medical expert in this type of case. Although the board was free to give less weight to his opinion because of this, we cannot find any reversible error based on this fact alone.

{¶ 12} With regard to the assertion Dr. Lewis did not know the difference between laser and VASER liposuction, appellant fails to cite where this may be found in the record. Notwithstanding, if appellant is referring to Dr. Lewis's statement that both VASER and laser liposuction are ultrasonic, Dr. Lewis clarified this on cross-examination when he said he did not intend to say they were both ultrasonic, and he pointed out he established shortly after stating such that laser uses light energy instead.

{¶ 13} As for Dr. Lewis's acknowledgement that cardiac arrest and death due to pulmonary embolism is a recognized complication of liposuction/fat transfer, the occurrence of a recognized complication does not necessarily preclude a finding the doctor was negligent. *See Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, ¶ 34 (even though all of the experts agreed the plaintiff's injury was a

known complication of the medical procedure, they differed on whether the surgeon was negligent); *Lewis v. Toledo Hosp.*, 6th Dist. No. L-03-1171, 2004-Ohio-3154, ¶ 18 (even though all of the experts agreed the plaintiff's injury was a recognized complication and known risk of the medical procedure, the surgeon could still be found negligent if the injury was a direct result of the failure to do what a surgeon of ordinary skill, care, and diligence would have done under like or similar circumstances). For these reasons, we find appellant's arguments without merit.

{¶ 14} Appellant next contends Dr. Lewis confused the proper standard of care opinion in medical matters (what a reasonable physician would do under like or similar circumstances) and the proper causation opinion regarding medical matters (the physician must express the opinion based on a reasonable degree of medical probability, i.e., that being more likely than not). Instead, appellant claims Dr. Lewis blended the reasonable degree of medical probability standard into all of his standard of care opinions. However, the portion of Dr. Lewis's testimony that appellant cites in support is unconvincing. Initially, the entire four-page excerpt cited relates to Dr. Lewis's testimony as an expert in a breast augmentation medical negligence case and not the present case, rendering its relevance dubious. Furthermore, the questions regarding standard of care and proximate cause may not have been clear, and whether Dr. Lewis was referring to the definition of standard of care or proximate cause is difficult to discern at times. Also, although appellant claims Dr. Lewis "blended" the definitions for standard of care and reasonable degree of medical probability, the questions and definitions were being provided by appellant's counsel, and appellant's counsel never mentioned the reasonable physician definition for standard of care opinions. Notwithstanding the foregoing, it is unclear to this court that Dr. Lewis was "blending" the definitions for standard of care and proximate cause. Although Dr. Lewis did not mention a reasonable physician standard when answering questions about standard of care, he appears to have indicated in his answers that standard of care opinions must be expressed in terms of a reasonable degree of medical probability. Expressing opinions to a degree of medical probability is required only of proximate cause opinions and is not required of standard of care opinions, *see Ernes v. Northeast Ohio Eye Surgeon's, Inc.*, 11th Dist. No. 2005-P-0043, 2006-Ohio-1456, ¶ 16, but it is not uncommon for experts to also express standard of care opinions to

a degree of medical probability, *see, e.g.*, *Jarvis v. Hasan*, 10th Dist. No. 14AP-578, 2015-Ohio-1779, ¶ 74, and *Fritch v. Univ. of Toledo College of Medicine*, 10th Dist. No. 11AP-103, 2011-Ohio-4518, ¶ 10. For these reasons, we can find no reversible error based on appellant's arguments.

{¶ 15} Appellant next argues that because, in offering his opinions, Dr. Lewis often offered his "best guess" or "best estimate," any opinion from Dr. Lewis should be excluded from being used as the requisite evidence to prove a violation of the Medical Practice Act. By "best guess," Dr. Lewis stated he meant a statement would be based on his experience and training and the most likely occurrence or event. Appellant directs us to one example of Dr. Lewis's use of "best estimate" and "best guess," in which he stated his "best estimate" was that Dr. Arthur Bing's statement there were areas of induration on Patient 1 was that the skin itself was inflamed, and his "best guess" was the inflammation was related to the treatment with the laser. Initially, we note Dr. Lewis's use of "best guess" and "best estimate," in this context, was in the interpretation of a doctor's report and not in rendering final standard of care or proximate cause opinions. Regardless, an expert opinion expressed to a "reasonable probability" means there is a greater than 50 percent likelihood. *Stinson v. England*, 69 Ohio St.3d 451, 455 (1994). Here, Dr. Lewis testified that "best guess" meant "most likely," which necessarily implies a greater than 50 percent likelihood. Therefore, we find this argument without merit.

{¶ 16} Appellant next points out Dr. Lewis agreed his experiences do not always establish what the minimal standard of care actually is—particularly since he strives to achieve the gold standard of care, which is above the minimal standard of care. However, appellant's counsel cross-examined Dr. Lewis on this exact issue and Dr. Lewis agreed his experience may not establish the actual standard of care, and there exists space between the minimum standard of care and the gold standard of care. Given Dr. Lewis's acknowledgement and appellant's ability to cross-examine him on the point, we find no error on this issue.

{¶ 17} Appellant next points out Dr. Lewis used the word "generally" to preface many of the aspects of standards and practices about which he testified and defined it as meaning 70 percent of the time. Appellant contends the use of the term "generally" is insufficient, as it would mean the entire remaining 30 percent would be below the

standard or outside of accepted practices. However, appellant fails to cite the record or present any specific argument regarding Dr. Lewis's use of this term. Given appellant's undeveloped assertion, we find the argument without merit.

{¶ 18} Appellant next argues Dr. Lewis improperly believed the guidelines set forth in Exhibit 14, entitled the Practice Advisory of Liposuction Executive Summary from the American Society of Plastic Surgeons, established the standard of care even though the document itself stated it does not. However, this exact issue was discussed in detail in Dr. Lewis's testimony, and appellant's counsel cross-examined him on the issue. Dr. Lewis made clear he acknowledged Exhibit 14 as guidelines and not standards but that the document came as close as possible to what the standards are for liposuction procedures. Given this acknowledgment from Dr. Lewis and appellant's cross-examination of him on the issue, we find appellant's assignment of error without merit.

{¶ 19} Appellant next argues the monitoring and recordkeeping requirements set forth in Ohio Adm.Code 4731-25-05 did not apply to appellant's liposuction treatment of Patient 1. The common pleas court found appellant admitted he failed to comply with the recordkeeping and patient monitoring requirements set forth in Ohio Adm.Code 4731-25-05. Indeed, at the hearing, appellant acknowledged he violated the monitoring and recordkeeping requirements in that section based on his reference in his operative record that he used "local tumescent" anesthesia. However, appellant now contends that he could not be in violation of Ohio Adm.Code 4731-25-05 because he did not use "local tumescent" anesthesia.

{¶ 20} For purposes of the present case, the monitoring and recordkeeping requirements set forth in Ohio Adm.Code 4731-25-05 apply only if appellant used "tumescent local anesthesia." Ohio Adm.Code 4731-25-02(G) provides:

> This chapter of the Administrative Code shall not apply to surgeries or special procedures in which the level of anesthesia is limited to minimal sedation as that term is defined in this chapter of the Administrative Code, or which use only local or topical anesthetic agents, and which are performed in an office setting except that liposuction procedures performed under tumescent local anesthesia shall be subject to the provisions of rule 4731-25-05 of the Administrative Code.

{¶ 21} Appellant maintains that, despite his hearing testimony, as it turns out, there was no evidence in the record to prove he actually used "tumescent local anesthesia" while performing liposuction on Patient 1. Specifically, appellant asserts there is no evidence in the hearing record the tumescent solution he utilized in treating Patient 1 contained both lidocaine and epinephrine, as required by the definition of "tumescent local anesthesia" set forth in Ohio Adm.Code 4731-25-01(N).

{¶ 22} Appellant's argument is not well-taken. Despite his current protestations, appellant admitted at the hearing he violated Ohio Adm.Code 4731-25-05 based on his use of tumescent local anesthesia. Not only did appellant's admission provide evidence on which the board could rely to support its order, *see Brownlee v. State Med. Bd. of Ohio*, 10th Dist. No. 13AP-239, 2013-Ohio-4989, ¶ 29 (doctor's own admissions support the board's order), but under the invited error doctrine, appellant is not entitled to take advantage of an error that he induced the trial court to make. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 243. Therefore, we find this argument without merit.

{¶ 23} Appellant next argues the board incorrectly concluded that Patient 1 was not a suitable candidate for liposuction. On this issue, the board found: (1) Patient 1 had poor skin tone and significant scarring, (2) despite her prior history of cosmetic procedures, Patient 1 still had persistent contour deformity, skin laxity, and scarring, and (3) laser liposuction was not appropriate because it would not have created any skin tightening due to the inadequate elasticity of Patient 1's skin, her age of 62 years, her prior surgeries, the waves in her abdomen, and the ridges and valleys on her thighs.

{¶ 24} In his brief, appellant fails to cite specific portions of the record to support his argument. He only generally directs this court to review Dr. Lewis's testimony and compare and contrast it with the above findings by the board. The only specific argument that appellant sets forth is that Dr. Lewis had no experience or training with laser liposuction. However, the trial court found Dr. Lewis's opinion was supported by the American Academy of Cosmetic Surgeons 2006 Guidelines on Liposuction and appellant's peer reviewed journal articles. Dr. Lewis also provided relevant testimony that a doctor can predict the skin injury to the patient based on the patient's age, the elasticity in the skin, and whether the patient has had a prior surgery. Here, as Dr. Lewis indicated, Patient 1 was older and had a number of procedures, creating an unpredictable amount of

swelling, improvement, and recovery. Given all the above, we find no error, and appellant's argument is without merit.

{¶ 25} Appellant next argues the board incorrectly found that his staging (the period between procedures) of Patient 1's liposuction was below the standard of care. Appellant maintains he testified that the areas at issue during the final two procedures were separate and distinct enough to avoid Dr. Lewis's concerns that he did not wait long enough—seven days—between procedures. Appellant also refutes Dr. Lewis's criticism that appellant did not properly stage the procedures on Patient 1's legs, pointing out that Dr. Lewis admitted there was less of a reason for staging if the treated areas were distinct, which appellant and his expert, Dr. Borsand, explained was the case here. Appellant asserts Dr. Lewis eventually agreed that a physician, in his judgment, could stage the treatment areas in the manner appellant did and still meet the standard of care.

{¶ 26} On this subject, the board found Dr. Lewis persuasively testified there was insufficient time between the second and third procedures because it takes 6 to 12 months for the area liposuctioned to heal. The board rejected appellant's argument that he operated on different areas during Patient 1's second and third procedures because even Dr. Borsand believed appellant was approaching close to the same areas, appellant's operative notes indicate that he performed laser liposuction on the right lateral hip and thigh in both procedures, and Dr. Lewis opined appellant operated on the exact same area in the second and third procedures.

{¶ 27} Appellant points us to his testimony that he first worked on the right lateral thigh and then later worked on the medial aspect of the right thigh, and they are two separate regions. He stated he was able to look at the contour and see where he could work during a subsequent procedure, especially if it was within a week of the prior procedure.

{¶ 28} Although appellant asks this court to make a credibility determination and/or weigh the competing testimony, our review here is for abuse of discretion. It is the duty of the board and the common pleas court to determine the credibility of witnesses and the weight afforded to each. We find the trial court did not abuse its discretion here. Appellant points out testimony that would support his position. However, there was also evidence that countered his contentions, and this is the evidence the board cited and

relied on in finding appellant's testimony unpersuasive. Dr. Lewis testified that it was a doctor's judgment that determines how close together two liposuction procedures should take place. He said "stacking" surgeries together, though, like appellant did, is not in the patient's best interest. The danger in working on the same or similar area in a short amount of time between procedures is that the doctor might not be able to determine where the last procedure stopped. Dr. Lewis stated that even if appellant, in his judgment, believed he could separate the prior treatment area and the subsequent treatment, it was Dr. Lewis's experience that this was not possible. He explained that, despite appellant's claim that he was working in a distinct area of the same leg in each of the procedures, Dr. Lewis said the areas in the thighs were the same in both procedures, and, furthermore, the effect of liposuction is not a local effect but a whole body physiologic effect. Dr. Lewis stated that one week after the first liposuction, a patient may be swollen and ten pounds heavier from IV fluid. He also testified that liposuction not only injures the area treated but the area around the treatment, and it is difficult to determine what to do because bruising and swelling may cloud the practitioner's judgment. Although Dr. Lewis agreed that two liposuction procedures could be performed within seven days and be within the minimal standard of care, his testimony was clear that he believed appellant's actions fell below the standard of care here because they were performed too closely together and involved the same part of the body. Therefore, we can find no abuse of discretion, and this argument is without merit.

{¶ 29} Appellant next argues his treatment of Patient 1 did not cause the damage to Patient 1's body observed by subsequent physicians. Appellant claims that any damage observed by subsequent doctors was the result of damage done by Patient 1's treatment providers before appellant and/or not allowing enough time for appellant's liposuction work to properly heal. Appellant asserts that Patient 1 had a long history of going from one physician to the next without giving any of them time to fully address her issues, and Dr. Lewis agreed that a physician cannot control when a patient is unwilling to follow up as requested. Appellant also points out that Dr. Borsand testified if Patient 1 had continued treatment with appellant, appellant would have been able to achieve the same results as the subsequent treating physicians.

{¶ 30} We disagree with appellant's contentions. The common pleas court did not abuse its discretion. There existed reliable, probative, and substantial evidence to support the board's conclusion. Dr. Lewis reviewed the reports from the follow-up doctors. Dr. Bing found a significant, residual, uneven area with areas of induration. Although Dr. Bing, in his report, agreed with appellant's proposition that the areas should "settle down" first before any attempts should be made to correct the misshapen areas, Dr. Bing clearly stated that he believed Patient 1 did not have a good result from appellant's procedures. With regard to Dr. Robert Heck, he performed a follow-up procedure in which he put fat back in areas that he believed were overtreated. In his report, Dr. Heck indicated he believed Patient 1's legs and hips were "horribly" disfigured by appellant and very uneven, with multiple surgeries required to correct the issues. Thus, despite appellant's assertion that it was too soon for these doctors to assess the damage, it is apparent they understood that results take time to assess. Still, they opined that they believed appellant's results were poor. Given this evidence, the trial court did not err in this respect.

{¶ 31} Appellant next turns his attention to his care of Patient 2. Appellant first argues that his injection technique and/or his documentation of the injection technique for Patient 2 did not fall below the standard of care. Appellant claims there is no reliable, probative, and substantial evidence that his fat injection technique and/or his documentation of the injection technique for Patient 2 fell below the standard of care. Appellant complains Dr. Lewis testified only that it was "typical" to document that practitioners aspirate and pull back on the syringe as part of their injection and agreed that not everyone documents such. Appellant also points out that he testified that he did, in fact, aspirate and pull back on the needle, although he did not document such.

{¶ 32} We disagree with appellant's contentions. Dr. Borsand testified practitioners are not required to document needle pull back prior to injecting because the technique is universally used by those who do fat transfer and is an assumed part of the procedure. However, Dr. Lewis spoke further about his statement that it was "typical" to document aspiration and needle pull back. Dr. Lewis testified that he did not believe every practitioner who performs an injection and aspirates and pulls back documents such. However, he said that if it is not documented, he would assume the practitioner did not aspirate and pull back. Because appellant did not document such, Dr. Lewis's testimony

was that he would assume appellant failed to do so. In sum, this was a credibility determination between two medical experts and a defendant doctor, and appellant has failed to provide us with any persuasive ground to find error. In the end, Dr. Lewis's testimony, if believed, provided a reasonable basis for the board's decision.

{¶ 33} We also note that insofar as appellant claims there was no basis for the board to believe appellant caused Patient 2's death, again, Dr. Lewis provided testimony that, if believed, would support such a finding. Dr. Lewis testified that if the practitioner aspirates and pulls back and fat still enters a large enough vein to cause an embolism, then the practitioner has done all he/she can do, and it is considered a known complication. However, Dr. Lewis made clear that, based on the particular anatomical site, the buttocks, it takes an injection technique that is below the standard of care to actually reach an area that contains a large vein. He said it takes a "good effort" to get deep enough to hit a vein at this site. In Dr. Lewis's opinion, based on the autopsy report, appellant's notes, and the nurses' notes, appellant directly injected fat into a vein or blood vessel. Although Dr. Lewis cautions he was not present and there is no way to be absolutely certain, based on the direct proximity of the injection, followed immediately by the patient's symptoms (seeing spots), and followed immediately by her arrest, the probability is that appellant placed fat directly into a large enough blood vessel for that fat to be swept into the lung to create a pulmonary embolus big enough to cause cardiopulmonary arrest. Despite appellant's arguments to the contrary, Dr. Lewis's opinion, if believed, would provide the necessary reliable, probative, and substantial evidence to support the board's conclusion that appellant's actions fell below the standard of care and caused Patient 2's death. Therefore, this argument is without merit.

{¶ 34} Appellant next argues there was no reliable, probative, and substantial evidence for the board to impose a monitoring requirement through a practice plan and/or impose a permanent restriction on appellant's medical license, preventing him from performing liposuction procedures in the future. Appellant points out that, since the events in this case, appellant has performed over 1,200 liposuction and/or fat transfer procedures without issue, and prior to the events at issue, he had performed 700 liposuction and/or fat transfer procedures without issue. He claims that, even if the restrictions are upheld by this court, there is no need to monitor his practice with a

cumbersome practice plan because there is no evidence of any other concerns with the remaining parts of his medical practice.

{¶ 35} However, when the common pleas court concludes the board's order was supported by reliable, probative, and substantial evidence, it is precluded from modifying the penalty imposed if the penalty was authorized by law. *Demint v. State Med. Bd. of Ohio*, 10th Dist. No. 15AP-456, 2016-Ohio-3531, ¶ 63, citing *Henry's Cafe, Inc. v. Bd. of Liquor Control*, 170 Ohio St. 233 (1959), paragraphs two and three of the syllabus. As we stated in *Demint*:

> The board has the authority to impose a wide range of sanctions, pursuant to R.C. 4731.22, ranging from reprimand to revocation. The board has the authority to restrict a physician's license permanently. *Clark v. State Med. Bd. of Ohio*, 10th Dist. No. 14AP-212, 2015-Ohio-251. * * * The discretion granted to the board in imposing a wide range of potential sanctions reflects the deference due to the board's expertise in carrying out its statutorily granted authority over the medical profession.

*Id.* at ¶ 63.

{¶ 36} Here, as discussed above and in the other assignments of error, we have concluded the common pleas court did not abuse its discretion when it determined the board's order was in accordance with law. Appellant has not argued the board's sanction was outside of those permissible. Thus, this argument is without merit. Therefore, considering all of the foregoing, we cannot find the common pleas court abused its discretion when it determined the board's order was based on reliable, probative, and substantial evidence, and appellant's argument to the contrary is without merit. Appellant's first assignment of error is overruled.

{¶ 37} Appellant argues in his second assignment of error the trial court erred when it affirmed the board's adjudication order, because the board violated R.C. 119.09 and appellant's due process rights by failing to charge him with not having the required training and experience to perform liposuction procedures, while still using his purported lack of training and experience as a basis for the sanction imposed through its adjudication order. Appellant points to the board's statement in its report that the case was a textbook example of what can happen when a physician practices outside his own

specialty area without having adequate training and experience. Appellant claims if the board believed he lacked proper education, training, and experience to perform the procedures at issue in the notice, then the notice of opportunity for hearing needed to include an allegation that he violated Ohio Adm.Code 4731-25-03(A)(1), which provides that a physician using moderate sedation/analgesia must demonstrate sufficient education, training, and experience to conform to the minimal standards of care of similar practitioners. Specifically, the board began its discussion of its proposed order by stating the following:

> This case is a textbook example of what can happen when a physician practices outside his own specialty area without having adequate training and experience and does not know his own limitations. Because of his lack of formal training in plastic and/or cosmetic surgery and arrogance, Dr. de Bourbon made several mistakes, including a critical one, in his care and treatment of Patients 1 and 2 which violated the standard of care and the Board's rule on office-based liposuction.

(May 31, 2016 Report & Recommendation at 55.)

{¶ 38} We disagree that the board's statement regarding appellant practicing outside his area of expertise and training necessarily required it to formally allege a violation in this respect. Initially, this paragraph expresses the board's general view of the case and is not a basis for any particular finding, although it was included under the sanction section. Notwithstanding, appellant fails to direct us to any authority for the proposition that the board cannot comment on issues or facts that touch on or relate to violations on which the board took no action. That the board decided not to take action on a violation of Ohio Adm.Code 4731-25-03 does not mean the board could not discuss evidence or draw conclusions related to the same subject matter included in that section. The nature of the board's statement was not in the form of a formal allegation but was a conclusion based on the evidence adduced to prove the charged violations. Indeed, appellant testified as to his training, experience, and credentials at the hearing, and we see no reason why the board could not use this testimony to draw related conclusions. Therefore, we find this argument without merit and overrule appellant's second assignment of error.

{¶ 39} Appellant argues in his third assignment of error the trial court erred when it affirmed the board's order, because the board violated R.C. 4731.22(F) and appellant's due process rights by failing to allow him to subpoena and present evidence of the Medical Board Quality Intervention Program's ("QIP") previous handling of concerns related to his care of Patient 1. In 2009-2010, appellant participated in the board's QIP in response to the board's concerns with appellant's recordkeeping and standard of care, particularly as it related to Patient 1. Appellant claims that, after participating in the QIP, the QIP panel never indicated that he failed to meet the applicable standard of care or violated R.C. 4731.22(B)(6) or (2o) with regard to Patient 1. Appellant asserts that, in defense of the present case, he should have been permitted to obtain and use any documents and evidence gathered during the QIP. Appellant contends that, in finding the QIP records were privileged, the board misapplied R.C. 4731.22(F)(5), which provides, in pertinent part:

> A report required to be submitted to the board under this chapter, a complaint, or information received by the board pursuant to an investigation or pursuant to an inspection under division (E) of section 4731.054 of the Revised Code is confidential and not subject to discovery in any civil action.

{¶ 40} The Supreme Court of Ohio has recognized that several groups and individuals have a privilege of confidentiality in the board's investigative files, including patients, the physician under investigation, and witnesses. *State ex rel. Wallace v. State Med. Bd. of Ohio*, 89 Ohio St.3d 431, 435 (2000). The court also has recognized that the board itself holds "its own confidentiality privilege." *Id.* at 436. Importantly, the board may not "unilaterally waive others' privileges to confidentiality, because the [board] is not the holder of those privileges." *Id.* Therefore, insofar as appellant's only argument here is that he was entitled to the QIP records because he waived his own privilege of confidentiality regarding the records, we conclude the board would not be permitted to disclose the files unless other protected persons, including patients, witnesses, and the board itself, waived the privilege. Appellant has produced no evidence these other parties have waived their respective privilege. For these reasons, the board did not err by precluding the disclosure of materials contained in appellant's QIP records, and the court

did not err by affirming the board's decision on this issue. Appellant's third assignment of error is overruled.

{¶ 41} Appellant argues in his fourth assignment of error the trial court erred when it affirmed the board's order, because the board's practice plan and monitoring physician requirements as part of the sanction violated this court's holding in *In re Eastway*, 95 Ohio App.3d 516 (10th Dist.1994). In *Eastway*, this court concluded the board could not legally require drug, alcohol, and psychiatric treatment as a condition for reinstatement of a suspended medical license when it had not charged the physician with being mentally impaired due to substance abuse, and the evidence did not demonstrate impairment.

{¶ 42} Appellant contends the present circumstances are similar to those in *Eastway*, in that without the ability to perform liposuction procedures, as imposed by the sanction, there would be no evidence of concern in the record regarding his other areas of practice to warrant the need for practice plan/monitoring requirements during probation. However, we find *Eastway* unpersuasive and not analogous to the present case. In *Eastway*, this court found the board's imposition of alcohol and mental health treatment to be error when there was no evidence supporting either in the record. However, here, the board concluded appellant's conduct departed from the minimal standards of care in several respects with regard to Patients 1 and 2. Under these circumstances, appellant's overall standard of care in the other aspects of his practice are relevant and may also be subject to scrutiny via a practice plan and monitoring during his period of probation. For these reasons, we find appellant's argument without merit and overrule his fourth assignment of error.

{¶ 43} Accordingly, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and BRUNNER, JJ., concur.

—————————————